**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

**J.P. MORGAN SECURITIES INC. and BEAR,** :
**STEARNS & CO. INC. (N/K/A J.P. MORGAN** :
**SECURITIES INC.),** :
                                 :
             **Plaintiffs,** :
                                 :
      - against - :
                                   :
**LOUISIANA CITIZENS PROPERTY** :
**INSURANCE CORPORATION,** :
                                 :
             **Defendant.** :
----------------------------------------------------------- X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:** _____
**DATE FILED: 5/3/10**

**OPINION AND ORDER**

**10 Civ. 2517 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

J.P. Morgan Securities Inc. ("JP Morgan") and Bear, Stearns & Co.

Inc. ("Bear Stearns") bring this action to enjoin an arbitration brought by Louisiana

Citizens Property Insurance Corporation ("Citizens") with the Financial Industry

Regulatory Authority ("FINRA").  In that arbitration proceeding – which is

scheduled to be heard in New Orleans, Louisiana – Citizens states various claims

against JP Morgan and Bear Stearns relating to the interest rates Citizens paid on

certain variable-rate bonds it issued.[1]  For reasons to be discussed, plaintiffs'

---

[1]    Citizens has also filed a complaint in the Eastern District of Louisiana
containing substantially identical allegations to those made in the arbitration
proceeding.  *See* Citizen's Complaint Against JP Morgan and Bear Stearns, Ex. C
to Declaration of Jonathan K. Youngwood ("Youngwood Decl.").  According to

-1-

motion for a preliminary injunction is denied.

## II.    BACKGROUND

### A.    The Auction Rate Securities

In April 2006, Citizens issued around one billion dollars in municipal bonds. Approximately three hundred million dollars of those bonds were auction-rate securities ("ARS") and approximately seven hundred million were fixed-rate bonds.[2] Pursuant to two bond purchase agreements, JP Morgan and Bear Stearns received fees and compensation from Citizens for acting as co-lead underwriters for the bonds and providing short-term bridge financing to Citizens in connection with the underwriting.[3] According to Citizens, JP Morgan and Bear Stearns also acted as advisers on the bond structure and related issues.[4] JP Morgan and Bear Stearns dispute that they were advisors – asserting that two other entities were

---

that complaint, Citizens filed in federal court "out of an abundance of caution, to avoid any defenses based on time bars or prescription in the event that the claims raised in this [c]omplaint are not arbitrated." *Id.* ¶ 20.

[2]      *See* Citizen's Statement of Claim Against JP Morgan and Bear Stearns Before FINRA ("Statement of Claim"), Ex. A to Youngwood Decl., ¶ 1.

[3]      *See* Declaration of Kent Hiteshew ("Hiteshew Decl."), a managing director at JP Morgan, ¶ 3; Declaration of Donald Wilbon ("Wilbon Decl."), a managing director at JP Morgan, ¶ 3.

[4]      *See* Statement of Claim ¶¶ 40-41.

hired by Citizens to serve in this role.[5]

ARS are variable-rate bonds whose interest rates are determined through periodic Dutch Auctions.[6] Investors specify the number of shares of the bonds they wish to purchase and the lowest bond interest rate they are willing to accept.[7] The bond's interest rate (the "Clearing Rate") until the next auction will be the lowest rate at which there are sufficient purchasers to purchase all the securities for sale at auction.[8] Any investor who bids at or below that Clearing Rate receives the bond at that rate. Investors who bid above the Clearing Rate receive no bonds. The auctions for Citizens's ARS bonds took place every thirty-five days.[9]

An ARS auction fails when the number of securities offered for sale exceeds the number of bids for purchase.[10] In the case of a failed auction, the interest rate until the next auction is set pursuant to a predetermined maximum rate

---

[5]    *See* Hiteshew Decl. ¶ 4; Wilbon Decl. ¶ 4.

[6]    *See* Statement of Claim ¶ 4.

[7]    *See id.* ¶¶ 4-5

[8]    *See id.* ¶ 4.

[9]    *See id.* ¶ 5.

[10]   *See id.* ¶ 6

set forth in the bonds' offering documents.[11]  The maximum rate in case of failure for Citizens's ARS was set at fourteen percent.[12]

### B.    The Derivative Transactions

On April 7, 2006, Citizens executed individual International Swaps and Derivative Association Inc. Master Agreements with JPMorgan Chase Bank, N.A. ("Chase Bank") and Bear Stearns Capital Markets Inc. ("BS Capital")  (the "Master Agreements"),[13] and two derivative transactions pursuant to the Master Agreements ("Derivative Transactions").[14]  The Derivative Transactions provide that if the USD-BMA (now SIFMA) Municipal Swap Index ("BMA Index") rises above a predetermined rate – five percent through December 1, 2008 and six percent through June 1, 2016 – Chase Bank and BS Capital will pay Citizens the

---

[11]     *See id.*

[12]     *See id.*

[13]     *See* BS Capital and Louisiana Citizens Master Agreement, Ex. A to Hiteshew Decl.; Chase Bank and Louisiana Citizens Master Agreement, Ex. C to Wilbon Decl. These entities are not named as defendants in the arbitration and are not parties to this action.

[14]     *See* Confirmation of BS Capital and Louisiana Citizens Derivative Transaction ("BS Capital Derivative Transaction Confirmation"), Ex. B. to Hiteshew Decl; Confirmation of Chase Bank and Louisiana Citizens Derivative Transaction ("Chase Bank Derivative Transaction Confirmation"), Ex. D to Wilbon Decl.

-4-

difference between the BMA Index and the respective predetermined interest rate.[15]
The Derivative Transactions are therefore, on their face, a hedge on Citizens's
interest rate exposure.[16]

## C.   The Arbitration

On December 18, 2009, Citizens filed an arbitration statement of
claim against JP Morgan and Bear Stearns with FINRA. According to the
Statement of Claim, JP Morgan and Bear Stearns were manipulating the market for
the ARS *without Citizens's knowledge* by placing blanket bids for the entire
notional amount of the bonds ("blanket bids") – effectively capping the ARS
interest rate at a level desirable to Citizens. Specifically, JP Morgan and Bear
Stearns allegedly omitted to disclose (1) that they were making these blanket bids;
(2) that the periodic auctions for the ARS would fail unless JP Morgan and Bear
Stearns continued to make these blanket bids; and (3) that the Derivative
Transactions would not effectively cap the ARS interest rate in the absence of the

---

[15]     *See* BS Capital Derivative Transaction Confirmation at1; Chase Bank
Derivative Transaction Confirmation at 2

[16]     Citizens asserts that JP Morgan and Bear Stearns advised Citizens to
enter into these agreements and represented that the transactions would be an
effective interest rate cap because the BMA Index was an accurate proxy for the
interest rates that would result from the auction of the ARS. *See* Statement of
Claim ¶ 44.

-5-

blanket bids.[17]

   While this did not initially injure Citizens, when JP Morgan and Bear Stearns stopped submitting the blanket bids in 2008,[18] the auctions began failing and the interest rates on the bonds spiked to fourteen percent, the maximum possible rate.[19]  In April 2009, Citizens refinanced its bonds entirely as fixed-rate instruments.[20]  Citizens seeks to recoup the extra interest that Citizens has paid as a result of the auction failures, the cost of refinancing the bonds, future interest payments at rates above the rate promised by JP Morgan and Bear Stearns, and the return of all commissions and fees paid to JP Morgan and Bear Stearns in connection with the issuance of, and the auctions for, the ARS.[21]  It asserts claims for breach of fiduciary duty, intentional and negligent misrepresentation, fraud, breach of contract, misrepresentations in violation of Rule 10b-5 of the Securities Exchange Act of 1934, breach of warranties, and detrimental reliance.[22]

   FINRA has indicated that the anticipated hearing location for the

---

[17] *See id.* ¶ 3.

[18] *See id.* ¶ 12.

[19] *See id.*

[20] *See id.* ¶ 86.

[21] *See id.* ¶ 13.

[22] *See id.* ¶¶ 92-119.

arbitration is New Orleans, Louisiana.[23]  JP Morgan and Bear Stearns assert that

they have a right to challenge FINRA's designation of New Orleans as the situs of

the arbitration and that venue for the arbitration properly lies in New York.[24]

While JP Morgan and Bear Stearns are undoubtedly correct that they have the right

to challenge the venue of the arbitration, this challenge must be heard by the

arbitrators.[25]  Under FINRA rules, when an arbitration involves a customer, FINRA

generally "will select the hearing location closest to the customer's residence at the

time of the events giving rise to the dispute."[26]  Because Citizens is a "non-profit

Louisiana corporation created by the Louisiana Legislature,"[27] there is a strong

likelihood that the arbitration will take place in New Orleans.  Accordingly, while

the arbitration proceedings may ultimately occur in New York, for purposes of this

motion for preliminary injunction, the arbitration must be treated as though it will

---

[23]     *See* Letter from FINRA to JP Morgan and Bear Stearns, Ex. A to
Declaration of James R. Swanson ("FINRA Letter"), counsel for Citizens, at 3.

[24]     *See* Reply Memorandum in Further Support of Plaintiffs' Motion for a
Preliminary Injunction at 3.

[25]     *See* FINRA Rule 12503(c)(2).

[26]     FINRA Rule 12213(a)(1). *Accord* FINRA Letter at 2 ("If an
arbitration involves a public customer, FINRA Dispute Resolution will generally
select a hearing location closest to the customer's residence at the time the dispute
arose.").

[27]     Statement of Claim ¶ 14.

occur within the Eastern District of Louisiana.

## III.  APPLICABLE LAW

"'The district court has wide discretion in determining whether to grant a preliminary injunction . . . .'"[28] Nonetheless, "'[a] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion.'"[29] "'A party seeking a preliminary injunction in this circuit must show: (1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.'"[30] "A preliminary injunction is an extraordinary remedy never awarded as of right."[31] "The purpose of a preliminary injunction is to preserve the *status quo*

---

[28]     *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quoting *Moore v. Consolidated Edison*, 409 F.3d 506, 511 (2d Cir. 2005)). *Accord Somoza v. New York City Dep't of Educ.*, 538 F.3d 106, 112 (2d Cir. 2008) (noting that a district court decision concerning a preliminary injunction is reviewed for abuse of discretion).

[29]     *Sussman v. Crawford*, 488 F.3d 136, 139-40 (2d Cir. 2007) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

[30]     *County of Nassau, N.Y. v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008) (quoting *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476 (2d Cir. 2004)).

[31]     *Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 365, 376 (2008) (citation omitted).

between parties pending a final determination of the merits."[32]

"'To satisfy the irreparable harm requirement, [petitioner] must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'"[33]  Moreover, irreparable harm by definition "'cannot be remedied by an award of monetary damages.'"[34]  In determining whether a plaintiff has demonstrated a likelihood of success on the merits of the "ultimate case, a court is not called upon finally to decide the merits of the controversy. It is necessary only that the court find that the plaintiff has presented a strong prima facie case to justify the discretionary issuance of preliminary relief."[35]

## IV.  DISCUSSION

---

[32]     *Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 143 F.3d 688, 692 (2d Cir. 1998).

[33]     *Grand River*, 481 F.3d at 66 (quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)).

[34]     *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 97 (2d Cir. 2005) (quoting *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995)). *Accord Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995) ("[W]here monetary damages may provide adequate compensation, a preliminary injunction should not issue.").

[35]     *Gibson v. U.S. Immigration & Naturalization Serv.*, 541 F. Supp. 131, 137 (S.D.N.Y. 1982) (citation omitted).

-9-

JP Morgan and Bear Stearns ask this Court to grant a preliminary

injunction enjoining its pending FINRA arbitration with Citizens. This Court's

power to enjoin that arbitration derives from the Federal Arbitration Act ("FAA").

Section 2 of the FAA establishes that compulsory arbitration agreements are

"valid, irrevocable, and enforceable" when "in writing."[36]  Section 4 of the FAA

provides courts with the power to compel an arbitration pursuant to a valid

agreement to arbitrate,[37] and to enjoin such an arbitration in the absence of an

applicable agreement.[38]  Because JP Morgan and Bear Stearns have not

demonstrated that they are likely to succeed in showing the absence of an

---

[36]    9 U.S.C. § 2.

[37]    *See id.* § 4.

[38]    While the FAA only explicitly empowers courts to compel
arbitrations, district courts in this Circuit have generally held that district courts
have the concomitant power to enjoin arbitration proceedings in appropriate
circumstances. *See Westmoreland Cap. Corp. v. Findlay*, 100 F.3d 263, 266 n.3
(2d Cir. 1996) ("Because we find that subject matter jurisdiction is lacking, we do
not need to decide whether the FAA gives federal courts the power to stay
arbitration proceedings.  While § 3 of the FAA gives federal courts the power to
stay trials pending arbitration, we note that a number of courts have held that, in
appropriate circumstances, § 4 of the FAA may be applied to stay or enjoin
arbitration proceedings."), *abrogated on other grounds, Vaden v. Discover Bank*,
129 S.Ct. 1292 (2009); *Oppenheimer & Co. Inc. v. Deutsche Bank AG*, No. 09 Civ.
8154, 2009 WL 488 4158, at *2 (S.D.N.Y. Dec. 16, 2009) (noting that only one
court in the Second Circuit has determined that it did not have the power to stay
arbitrations under the FAA); *Satcom Int'l Group PLC v. Orbcomm Int'l Partners,
LP*, 49 F. Supp. 2d 331, 342 (S.D.N.Y. 1999).

agreement requiring arbitration of the dispute at issue, I deny their motion for a preliminary injunction. A denial of a motion to enjoin an arbitration ordinarily has the effect of compelling that arbitration. However, as will be discussed below, in this instance, I do not have the power to compel the arbitration because it is scheduled to proceed outside of this district.

## A.     Likelihood of Success on the Merits or Serious Questions Going to the Merits

While there is no arbitration agreement between either Citizens and JP Morgan or Citizens and Bear Stearns, FINRA rules may establish the requisite arbitration agreements.[39] By becoming members of FINRA, JP Morgan and Bear Stearns have agreed to submit to FINRA rules, including FINRA Rule 12200, which requires members to arbitrate disputes in connection with their business activities if and when arbitration is demanded by a customer.[40] This Rule creates

---

[39]     The Second Circuit has ruled that district courts, rather than the relevant arbitrator, must determine whether parties are required to litigate under FINRA rules. *See Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) ("[T]he [FINRA] Code does not evidence a 'clear and unmistakable' intent to submit the issue of arbitrability to arbitrators where only one party is a [FINRA] member and the parties do not have a separate agreement to arbitrate. . . . [Accordingly,] [t]he Court was required to render a final decision on Bensadoun's claim that the Investors had no right to arbitrate their claims against him.").

[40]     *See* FINRA Rule 12200; *Citigroup Global Mkts., Inc. v. VCG Special Opportunities*, 598 F.3d 30, 32 n.1 (2d Cir. 2010) ("In relevant part, FINRA Rule 12200 requires members of the FINRA to arbitrate the disputes pursuant to the FINRA Code of Arbitration Procedure if arbitration is 'requested by [a] customer,'

-11-

"a compulsory arbitration agreement" between FINRA and its members, of which customers are intended "third party beneficiaries."[41]  Accordingly, for Citizens to trigger this compulsory arbitration agreement, it must establish (1) that it is a customer of JP Morgan and Bear Stearns and (2) that the dispute arises in connection with the business activities of JP Morgan and Bear Stearns.

## 1.    Customer

FINRA rules do not provide a comprehensive definition of the term customer, stating only that "[a] customer shall not include a broker or dealer."[42]

---

'[t]he dispute is between a customer and a member or associated person of a member,' and '[t]he dispute arises in connection with the business activities of the member.'").

[41]    *Oppenheimer & Co., Inc. v. Neidhardt*, No. 93 Civ. 3854, 1994 WL 176976, at *1 (S.D.N.Y. May 5, 1994), *aff'd*, 56 F.3d 352 (2d Cir. 1995). *Accord Kidder, Peabody & Co., Inc. v. Zinsmeyer Trusts P'ship*, 41 F.3d 861, 863-64 (2d Cir. 1994) (citing Oppenheimer for the proposition that FINRA's compulsory arbitration rule "constitutes an 'agreement in writing' under the Federal Arbitration Act"); 9 U.S.C. § 2 ("[A]n agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.").

[42]    FINRA Rule 12100(i).  There are two other National Association of Securities Dealers ("NASD") rules, adopted by FINRA, that define the term customer. *See* NASD Conduct Rule 2270(b) (defining "customer" as "any person who, in the regular course of such member's business, has cash or securities in the possession of such member"); NASD Conduct Rule 2520(a)(3) ("[T]he term 'customer' means any person for whom securities are purchased or sold or to whom securities are purchased or sold.").  However, these rules are expressly limited in application to these particular sections of the NASD Code of Conduct.

Accordingly, courts have been forced to look beyond this exclusionary definition

to determine whether particular entities are customers within the meaning of Rule

12200. Only one court has considered whether an issuer is a customer of an

underwriter. In *Patten Securities Corp., Inc. v. Diamond Greyhound & Genetics,*

*Inc.*, the Third Circuit determined that an issuer was a customer for purposes of a

compulsory arbitration rule promulgated by NASD, the predecessor of FINRA.[43]

The court based its determination on an NASD committee statement that the

compulsory arbitration provision then in force was meant to cover disputes arising

"over a proposed underwriting."[44] Because the contemporary rule has been

altered,[45] this interpretive statement is no longer binding. Nevertheless, the

statement remains the most compelling evidence of whether FINRA's compulsory

---

[43] *See* 819 F.2d 400, 405-06 (3d Cir. 1987), *abrogated on other grounds*, *Delbrosso v. Spang & Co.* 903 F.2d 234, 236 n.2 (3d Cir. 1990).

[44] *Id.* at 406.

[45] FINRA Rule 11200 of the Code is an amended version of former NASD Rule 10301, which took effect on April 16, 2007. *See Herbert J. Sims & Co., Inc. v. Roven*, 548 F. Supp. 2d 759, 763 n.2 (N.D. Cal. 2008) (citing Comparison Chart of Old and New NASD Arbitration Codes for Customer Disputes, Rule 12200, www.finra.org/web/groups/rules_regs/documents/rule_filing/p018366.pdf). There is no substantial difference between Rule 10301 and Rule 11200. *See id.* Prior to Rule 10301 another NASD rule, which the Third Circuit interpreted in *Patten*, was controlling. It stated "that any dispute 'shall be arbitrated under this Code, as provided for by any duly executed and enforceable written agreement or upon the demand of a customer.'" *See Patten*, 819 F.2d at 406 (quoting Rule 10301).

-13-

arbitration rule is intended to cover disputes between underwriters and issuers.

JP Morgan and Bear Stearns advance three arguments in support of their position that an issuer should not be a customer for purposes of Rule 12200. *First*, JP Morgan and Bear Stearns urge this Court to adopt the Eighth Circuit's definition of customer[46] – which has been cited approvingly, but not adopted, by the Second Circuit.[47] In *Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc.*, the Eighth Circuit, determined that providing banking and financial advice does not create a customer relationship. It defined customer as "one involved in a business relationship with [a FINRA] member that is related directly to investment or brokerage services."[48] Although that definition could be construed to exclude the issuer/underwriter relationship, the Eighth Circuit specifically distinguished *Patten* – stating that "although the relationship [in *Patten*] was not a broker/investor relationship, [the issuer/underwriter relationship] still related directly to the issuance of securities, rather than banking advice. . . ."[49] Accordingly, the Eighth

---

[46]   *See Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc.*, 264 F.3d 770, 772 (8th Cir. 2001).

[47]   *Bensadoun*, 316 F.3d at 176. *Accord UBS Secs. LLC v. Voegeli*, __ F. Supp. 2d __, No. 09 Civ. 8872, 2010 WL 289302, at *4 (S.D.N.Y. Jan. 26, 2010) (adopting the *Fleet Boston* definition).

[48]   *Fleet Boston*, 264 F.3d at 772.

[49]   *Id.* at 772 n.3.

Circuit's definition, while generally helpful in defining the term customer, is unavailing in this instance.

*Second*, JP Morgan and Bear Stearns argue that courts in this district have "viewed the terms 'customer' and 'investor' synonymously."[50] Plaintiffs misread the cases they cite. It is well established that an investor is a customer of a financial firm that acts as its broker. While the cases cited by plaintiffs affirm this proposition,[51] they do not support the conclusion that the broker/investor relationship is the only relationship sufficient to satisfy Rule 12200. The rule that an investor is a customer of its broker is a rule of inclusion, not exclusion.

*Third*, JP Morgan and Bear Stearns cite a Municipal Securities Rulemaking Board ("MSRB") rule that excludes issuers from its definition of the term customer.[52] Plaintiffs' reference to this rule is also unavailing. Because

---

[50]    JP Morgan and Bear Stearns' Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction ("JP Morgan/Bear Stearns Mem.") at 11.

[51]    *See Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, No. 08 Civ. 5520, 2008 WL 4891229, at * 11 (S.D.N.Y. Nov. 12, 2008), *aff'd*, 598 F.3d 30 (2d Cir. 2010) ("[I]f an investor invests directly with a member firm, the investor is likely a 'customer' of that firm."); *Sands Bros. & Co., Ltd. v. Ettinger*, No 03 Civ. 7854, 2004 WL 541846, at *3 (S.D.N.Y. Mar. 19, 2004) ("An investor is a 'customer' of a brokerage house . . . only for conduct that falls within the scope of the specific account between the investor and the brokerage house.").

[52]    *See* JP Morgan/Bear Stearns Mem. at 11-12 (citing MSRB Rule D-9).

MSRB is a distinct entity from FINRA, there is little reason its rules should influence the definition of customer for purposes of FINRA's compulsory arbitration agreement.

Rule 12200 is enforced on the ground that it reflects the intent of members to submit to arbitration in appropriate circumstances. It is unfortunate that a more comprehensive and precise definition of "customer" has not been provided by FINRA. Nevertheless, in light of the Second Circuit's instruction that "any ambiguity in the meaning of 'customer' . . . should be construed in favor of arbitration,"[53] I determine that an issuer is a customer of an underwriter.

## 2.    In Connection with the Business Activities of the Member

In order to compel arbitration under Rule 12200, the dispute raised in the arbitration must also arise in connection with the "business activities of the member." JP Morgan and Bear Stearns argue that because Citizens's purported damages arise exclusively from the alleged ineffectiveness of the Derivative Transactions in capping the ARS interest rates, Citzens's claims do not arise out of JP Morgan and Bear Stearns's business activities, but out of the business activities of  Chase Bank and BS Capital (which were the counterparties to those

---

53      *Bensadoun*, 316 F.3d at 176.

transactions).[54]

While this may be JP Morgan and Bear Stearns's theory of liability, it is apparent from the arbitration Statement of Claim that it is not Citizens's theory of liability.[55] Citizens does allege that JP Morgan and Bear Stearns failed to inform it that the Derivative Transactions would not effectively cap the ARS interest rates.[56] However, it primarily seeks damages against JP Morgan and Bear Stearns for omitting to inform it that the ARS auctions would fail unless JP Morgan and Bear Stearns made blanket bids on those securities.[57] This allegedly fraudulent omission is the nub of Citizens's Statement of Claim and relates directly to plaintiffs' role as underwriters of the ARS bonds issued by Citizens.

JP Morgan and Bear Stearns cite a single district court case, *Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund Ltd.*, in support of

---

[54]     *See* JP Morgan/Bear Stearns Mem. at 12-15.

[55]     *See Spear, Leeds & Kellog v. Central Life Assur. Co.*, 85 F.3d 21, 28 (2d Cir. 1996) ("Another way of expressing this is to say that arbitration must not be denied unless a court is positive that the clause it is examining does not cover the *asserted dispute.*" (emphasis added)); *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 57 (2d Cir. 2001) (holding that for purposes of determining arbitrability courts consider only whether the asserted dispute falls under NASD's compulsory arbitration rule, and not whether the underlying legal arguments that will be raised in the dispute are meritorious).

[56]     *See* Statement of Claim ¶ 3.

[57]     *See id.*

-17-

their assertion that Citizens's claims do not relate to their business activities.  In

that case, Citigroup Global Markets ("CGMI") provided brokerage services for a

hedge fund, VCG Special Opportunities Master Fund Limited ("VCG").[58]  VCG

also entered into a related credit default swap agreement with Citibank, N.A.

("Citibank").[59]  When Citibank declared a writedown of the assets covered by the

credit default swap agreement, VCG's obligation under the agreement to pay

CGMI ten million dollars was triggered.[60]  In addition to bringing a civil action

against Citibank for its losses, VCG also began arbitration proceedings against

CGMI seeking damages based on CGMI's alleged role in the credit default swap.[61]

In response, CGMI filed a motion for a preliminary injunction enjoining the

arbitration.[62]

      In *Citigroup Global Markets*, there was no dispute over whether the

VCG hedge fund was the customer of CGMI based on CGMI's role as VCG's

broker.[63]  The disputed issue was whether VCG was a customer of CGMI for

---

[58]    *See Citigroup Global Mkts.*, 2008 WL 4891229, at *1

[59]    *See id.*

[60]    *See Citigroup Global Mkts.*, 598 F.3d at 32.

[61]    *See Citigroup Global Mkts.*, 2008 WL 4891229, at *2.

[62]    *See id.*

[63]    *See id.* at *4.

purposes of the credit default swap.[64] VCG contended that it was a customer for this purpose both because CGMI had acted as an agent for Citibank in entering the credit default swap agreement and because CGMI had acted as a fiduciary adviser to VCG on that agreement.[65] The district court disagreed – finding that there were "serious questions raised about whether VCG qualifies as a 'customer' in the swap transaction."[66] Specifically, the district court determined that CGMI had introduced sufficient evidence to raise serious questions as to whether CGMI had played either of the roles in the credit default swap alleged by VCG.[67]

While bearing certain factual similarities, *Citigroup Global Markets* is distinguishable from this case. In *Citigroup Global Markets*, the arbitration claims were entirely dependent on the credit default swap agreements. Accordingly, the court had to determine whether these agreements "create[d] a customer relationship between CGMI and VCG."[68] In this case, Citizens's theory of liability does not

[64] *See id.*

[65] *See id.*

[66] *See id.* at *5.

[67] *See id.*

[68] *Id.* at *4. Although the court in *Citigroup Global Markets* discussed this issue in the context of whether the party seeking to arbitrate was a "customer," *see id.*, plaintiffs have cited this case to support their argument that the instant dispute does not arise in connection with their "business activities." The *Citigroup Global Markets* court also dealt with the "business activities" prong of

-19-

rely on the Derivative Transactions. Instead, it relies largely on JP Morgan and
Bear Stearns's alleged failure to inform Citizens that they would need to place
blanket bids on the ARS to effectively keep interest rates low. This dispute arises
directly from the parties' issuer/underwriter relationship – which, as discussed, did
create a customer relationship between the parties. Accordingly, plaintiffs have
not demonstrated that they are likely to show that the instant dispute does not arise
in connection with their business activities.

## B.   Power to Compel

In general, a court order denying a petition *to enjoin* an arbitration has
an identical effect to an order *compelling* that arbitration. Petitions to compel and
petitions to enjoin are two sides of the same coin.[69] If the court determines there is
an applicable agreement to arbitrate, the parties are compelled to arbitrate the
covered dispute. If the court determines that there is no applicable agreement to
arbitrate, the arbitration cannot proceed. In this instance, however, this Court lacks
the authority to compel the arbitration because it is scheduled to occur outside of

---

FINRA Rule 12200. However, that issue – whether FINRA arbitration is limited
solely to disputes related to securities – is not relevant here. *See id.* at *6.

[69]     *See Societe Generale de Surveillance, S.A. v. Raytheon Eur. Mgmt.
and Sys. Co.*, 643 F.2d 863, 868 (1st Cir. 1981) ("[T]o enjoin a party from
arbitrating where an agreement to arbitrate is absent is the concomitant of the
power to compel arbitration where it is present.").

the Southern District of New York.

Section 4 of the Federal Arbitration Act ("FAA") authorizes district

courts to compel arbitration where appropriate.[70]  It provides in relevant part:

> A party aggrieved by the alleged failure, neglect, or refusal of
> another to arbitrate under a written agreement for arbitration may
> petition any United States district court which, save for such
> agreement, would have jurisdiction under Title 28, in a civil action
> or in admiralty of the subject matter of a suit arising out of the
> controversy between the parties, for an order directing that such
> arbitration proceed in the manner provided for in such agreement.
> . . . The court shall hear the parties, and upon being satisfied that
> the making of the agreement for arbitration or the failure to
> comply therewith is not in issue, the court shall make an order
> directing the parties to proceed to arbitration in accordance with
> the terms of the agreement.  *The hearing and proceedings, under
> such agreement, shall be within the district in which the petition
> for an order directing such arbitration is filed.*[71]

The difficulty in determining whether this Court has the power to compel an

arbitration in New Orleans arises from the final two sentences of the above-quoted

portion of section 4.  The first sentence instructs the district court, if it determines

arbitration is appropriate, to direct the parties to proceed with the arbitration "in

accordance with the terms of the agreement."  The second sentence states that the

arbitration shall proceed "within the district in which the petition for an order

directing such arbitration is filed."  While these provisions can in many instances

---

[70]   *See* 9 U.S.C. § 4.

[71]   *Id.* (emphasis added)

-21-

be read together without conflict, if the arbitration agreement contains a forum

selection clause requiring the arbitration to occur in a district other than where the

petition to compel was filed, it is impossible to comply with both directives. A

compelled arbitration will either not take place where the agreement directs or will

not take place in the district where the petition to compel was filed.

The situation in this case is slightly more complex as there is no

agreement to arbitrate between either Citizens and JP Morgan or Citizens and Bear

Stearns. However, as discussed, Rule 12200 creates a compulsory arbitration

agreement between FINRA members and FINRA, and makes customers third party

beneficiaries of that agreement. As an addendum to that notional agreement, Rule

12213(a) essentially creates a forum selection clause dictating that FINRA, in

accordance with its rules, will determine the location of the arbitration.[72]  FINRA

rules therefore can create a situation analogous to that caused by arbitration

agreements containing forum selection clauses. If this Court were to compel

arbitration when FINRA has already selected a forum outside of the Southern

District of New York, doing so would either violate the statutory directive that the

arbitration proceed in accordance with the agreement or the statutory directive that

arbitration occur within the same district as the court where the petition to compel

---

[72]      *See* FINRA Rule 12213(a) ("The Director will decide which of
FINRA's hearing locations will be the hearing location for the arbitration. . . .").

was filed.

Circuit courts have taken three distinct approaches to interpreting section 4 when arbitration agreements contain forum selection clauses.[73] *First*, the Fifth Circuit has held that a district court may compel arbitration in the venue specified by the arbitration agreement even if the specified venue is in a district other than where the petition to compel was filed.[74] This approach retains the intent of the parties' agreement to arbitrate, but, as the Fifth Circuit recognized, is "contrary to the express terms of the [FAA]."[75] It requires courts to ignore the statutory directive that the arbitration proceed in the district where the petition was filed.[76]

*Second*, the Ninth Circuit determined that a district court can compel arbitration in its own district regardless of whether a forum selection clause

---

[73]    *See Ansari v. Qwest Commc'n Corp.*, 414 F.3d 1214, 1218-20 (10th Cir. 2005) (describing the three approaches).  The Second Circuit has not decided this issue.

[74]    *See Dupuy-Busching Gen. Agency, Inc. v. Ambassador Ins. Co.*, 524 F.2d 1275, 1276-77 (5th Cir. 1975).

[75]    *Id.* at 1276.

[76]    *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

-23-

specifies a venue outside of the district where the petition to compel was filed.[77]
As with the first approach, this interpretation requires courts to ignore a clear
statutory directive – this time that the arbitration proceed in "accordance with the
terms of the agreement." By overriding the intent of the parties' agreement, it is
also contrary to the established policy that "arbitration 'is a matter of consent, not
coercion.'"[78]

---

[77]    *See Textile Unlimited, Inc. v. A.BMH & Co.*, 240 F.3d 781, 784-86
(9th Cir. 2001). Although the Ninth Circuit was dealing with a petition to enjoin
an arbitration proceeding, most of its reasoning is applicable to both petitions to
compel and petitions to enjoin arbitration proceedings. *See id.* at 785 ("[B]y its
terms, § 4 only confines the arbitration to the district in which the petition to
compel is filed. It does not require that the petition be filed where the contract
specified that arbitration should occur.").

[78]    *Ross v. American Express Co.*, 547 F.3d 137, 142-43 (2d Cir. 2008)
(quoting *Volt Info. Scis. v. Board of Trs. of Leland Stanford Junior Univ.*, 489 U.S.
468, 479 (1989)). The Ninth Circuit partly relied upon the Supreme Court's
determination that the venue provisions of sections 9 through 11 of the FAA "are
discretionary, not mandatory" in determining that the venue provisions of section 4
are not mandatory. *Textile Unlimited*, 240 F.3d at 784 (citing *Cortez Byrd Chips,
Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 194-96 (2000). However, "unlike
[sections 9 through 11] which use the permissive language 'may,' [section] 4 uses
the mandatory language 'shall.' Thus, the different sections have different venue
provisions." *Ansari*, 414 F.3d at 1219.

*Third*, the Sixth,[79] Seventh[80] and Tenth[81] Circuits have all held that where the arbitration agreement designates a specific forum, only a district court in that forum may compel arbitration.  While this approach prevents courts from violating either statutory directive, it runs contrary to another provision of section 4 which states that a party "may petition *any* United States district court" for an order compelling arbitration.[82]  The third approach does not strictly require courts to ignore this statutory language – as the statute in this instance uses the permissive term "may," while the other two statutory directives use the mandatory term "shall."  However, it renders section 4's statement that a party "may petition any United States district court" meaningless in instances where the arbitration agreement has a forum selection clause.  There is little point in a party filing a petition to compel an arbitration in a court that cannot provide that remedy.

All three interpretations are imperfect in that they lead to internal statutory contradictions.  Most likely, this is the result of a failure of those enacting

---

[79]    *See Inland Bulk Transfer Co. v. Cummings Engine Co.*, 332 F.3d 1007, 1018 (6th Cir. 2003).

[80]    *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 326-31 (7th Cir. 1995).

[81]    *See Ansari*, 414 F.3d at 1218-20.

[82]    9 U.S.C. § 4 (emphasis added).

the statute, which passed in 1925,[83] to fully anticipate the widespread use of forum

selection clauses in arbitration agreements. Nevertheless, I follow the majority of

circuits in adopting the third approach. Unlike the first two approaches, it does not

require the Court to ignore clear statutory language (although it does render one

provision of section 4 meaningless under certain circumstances). Unlike the

second approach, it also protects the contractual intent of the parties – allowing

them to arbitrate in the forum they have selected.[84]

---

[83]     *See E.C. Ernst, Inc. v. Potlatch Corp.*, 462 F. Supp. 694, 698 n.8
(S.D.N.Y. 1978).

[84]     *See Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581 (2008)
("Congress enacted the FAA to replace judicial indisposition to arbitration with a
national policy favoring [it] and plac[ing] arbitration agreements on equal footing
with all other contracts." (quotation marks omitted)). Courts have also cited
section 4's legislative history is support of the third approach. *See Merrill Lynch*,
49 F.3d at 329 ("Section 4 is aimed at streamlining the path toward arbitration and
preventing scattershot attacks in various judicial fora."). The relevant legislative
history is slim. "In describing the effects of [the proviso requiring the arbitration to
occur in the district where the petition to compel was filed], the Senate Committee
on the Judiciary indicated that a party seeking to compel arbitration would be
required to apply to the proper district court." *See E.C. Ernst*, 462 F. Supp. at 698
n.8 (citing S.Rep.No.536, 68th Cong., 1st Sess. 3 (1924)). Senator Hattie Caraway
is also reported as querying during Senate debates whether the statement in section
4 "'touching the question as to where the arbitration shall take place' was still in
the bill '[s]o it was not possible to drag a man across the country to arbitrate.'" *See
E.C. Ernst*, 462 F. Supp. at 697-99 (quoting S. Rep. No. 536, 68th Cong., 1st Sess.
3 (1924)). While this scattered legislative history is neither clear nor definitive, it
can be read to support the third approach – which would prevent petitioners from
dragging their opponents to districts other than where the parties agreed to
arbitrate.

Accordingly, I cannot compel the arbitration to proceed so long as it remains pending in New Orleans. If Citizens wishes to obtain an order compelling that arbitration, it will have to seek that order in the United States District Court for the Eastern District of Louisiana.[85]

## V.    CONCLUSION

For the aforementioned reasons, JP Morgan and Bear Stearns's motion for a preliminary injunction is denied. The Clerk of Court is directed to close this motion (Docket No. 3) and this case.

SO ORDERED

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            April 30, 2010

---

[85]      If Citizens does make a motion to compel in the appropriate district, that court may not be bound by my determination on this preliminary injunction motion.

-27-

## - Appearances -

**For Plaintiffs:**

Thomas C. Rice, Esq.
Jonathan K. Youngwood, Esq.
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-2000
Fax: (212) 455-2502

**For Defendant:**

Jason W. Burge, Esq.
Loretta G. Mince, Esq.
James Richard Swanson, Esq.
Fishman Haygood Phelps Walmsley Willis & Swanson, LLP
201 St. Charles Ave.
46th Floor
New Orleans, LA 70170-4600
Tel: (504)-586-5252
Fax: (504)-586-5250

Daniel Eric Shaw, Esq.
Schindler Cohen & Hochman
100 Wall Street
New York, NY 10005
Tel: (212) 277-6319
Fax: (212) 277-6333